371 P.2d 241

George O. CAESAR, Plaintiff-Respondent,

v.

Arnold WILLIAMS, Secretary of State of the State of Idaho, Defendant-Appellant.

No. 9158.

Supreme Court of Idaho.

April 3, 1962.

Rehearing Denied May 8, 1962.

Frank L. Benson, Atty. Gen., Warren Felton, Asst. Atty. Gen., Boise, Swayne & McNichols, Orofino, William J. Dee, Grangeville, for appellant.

Richards, Haga & Eberle, Boise, for respondent.

C. H. Higer, amicus curiae, Emmett, for appellant.

Herman J. McDevitt, amicus curiae, Pocatello, for respondent.

McFADDEN, Justice.

This action was instituted by respondent, a resident, taxpayer and qualified elector of Ada County, against appellant as Secretary of State to enjoin him from certifying to the respective county auditors the number of representatives each county will be entitled to elect at the forthcoming general election, (in November 1962) pursuant to the requirements of I.C. § 67–203 (as amended S.L.1951, ch. 60, sec. 1). Respondent contends that the amendment of I.C. § 67–203, by S.L.1951, ch. 60, § 1, is unconstitutional, as is the previous enactment, S.L.1941, ch. 87, § 1. He contends that S.L.1933, ch. 75, § 1, is the only constitutional enactment under which appellant can act. Respondent, in the district court, also sought mandate to require the Secretary of State to make such certification to the respective county auditors of the number of representatives to be elected, solely on the basis of the 1933 act.

In his complaint, respondent alleges that neither the 1951 act, nor the 1941 act, provides substantially equal representation for the people of Ada County and of certain other populous counties, for the reason that each such enactment establishes an excessively high minimum number of persons per representative; and an excessively low minimum number of persons for the next additional representative, which is but a small percentage of the whole minimum number established for the first representative; that on the basis of the 1960 U. S. census, the 1951 and 1941 amendments are arbitrary and capricious, and result in 15.-2% of the population of the State, residing in 22 counties each of a population of 8,500

or less, having 35% of the representation of the house of representatives.

Appellant in his answer, generally denied the allegations of unconstitutionality of the enactments in question, and prayed that the court declare the action as one for declaratory relief, and determine under which act appellant should perform his statutory duties.

In answer to interrogatories and request for admissions, appellant admitted the correctness of the figures reflected in the 1960 census, (attached as an exhibit to respondent's complaint); and that under the 1960 census, on the basis of the 1951 enactment, appellant could certify a total of 63 representatives for the entire state (6 for Ada County). The 1933 act, on the basis of the 1960 census, would increase the total representatives to 79 (with 9 apportioned to Ada County).

The trial court, upon disposition of respondent's motion for judgment on the pleadings, treated as a motion for summary judgment, entered finding of fact generally finding that the 1951 and 1941 enactments as applied to the 1960 census, result in arbitrary, capricious and substantially unequal representation in the house of representatives of the more populous counties, in comparison to the less populous counties of the state; and in its conclusions of law, the court concluded that the 1951 and 1941 enactments are unconstitutional, but that the 1933 enactment should control in that it affords more equal representation than the other two acts, and constituted the last valid and constitutional apportionment act. In its judgment, the court required certification by appellant on the basis of the 1933 act.

This appeal resulted, the notice of appeal having been signed and regularly filed by one of appellant's resident attorneys. Respondent moved to dismiss the appeal challenging its validity on the ground that it is not signed either by the appellant personally, or by an authorized member of the attorney general's staff.

This Court is cognizant of the provisions of I.C. § 67–1401 which specifies some of the duties of the attorney general. The right of the attorney general to appear has not been questioned and we are not here concerned with any reason why he did not participate in this appeal. The record discloses that a member of the attorney general's staff represented appellant in the district court; also, that this appeal was taken with the full knowledge of the attorney general in that he, through a member of his staff, specifically requested in writing that the attorneys representing appellant, be substituted for the attorney general, as attorneys of record for appellant on this appeal.

No contention of usurpation of the rights or power of the attorney general by ap-

**260**

pellant's present counsel is even inferred, and we are not here concerned with any question as to whether the attorney general properly delegated his power or authority to appear herein. Both the appellant and the attorney general were personally present during the oral presentation of this appeal. The attorneys representing appellant are members in good standing of the Idaho State Bar who have appeared as members of the Bar and in no other capacity, at the request of appellant and without cost to the State of Idaho. The motion to dismiss is without merit and is denied.

■ Appellant by his specifications of error challenges the right of the trial court to assume jurisdiction of the cause, and claims error committed by the court in declaring that the 1933 enactment is the last valid apportionment act.

Concerning the first specification of error, appellant, in questioning the right of the trial court to assume jurisdiction of the case, relies primarily on Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L. Ed. 1432, a case which originated in Illinois. Courts of various other states have recognized their jurisdiction to deal with apportionment statutes. Parkinson v. Watson, 1955, 4 Utah 2d 191, 291 P.2d 400; Brooks v. State, 1904, 162 Ind. 568, 70 N.E. 980; Brown v. Saunders, 1932, 159 Va.

28, 166 S.E. 105; Stiglitz v. Schardien, 1931, 239 Ky. 799, 40 S.W.2d 315; State ex rel. Thomson v. Zimmerman, 1953, 264 Wis. 644, 60 N.W.2d 416, 61 N.W.2d 300; Asbury Park Press, Inc. v. Woolley, 1960, 33 N.J. 1, 161 A.2d 705; State v. Cunningham, 1892, 81 Wis. 440, 51 N.W. 724, 15 L.R.A. 561; In re Sherill, 1907, 188 N.Y. 185, 81 N.E. 124; Attorney General v. Secretary of the Commonwealth, 1940, 306 Mass. 25, 27 N.E.2d 265; Donovan v. Holzman, 1956, 8 Ill.2d 87, 132 N.E.2d 501; 16 C.J.S. Constitutional Law § 147, pp. 708–709.

In the most recent opinion of Baker v. Carr, released March 26, 1962, 82 S.Ct. 691, the Supreme Court of the United States recognizes that it is within the province of the courts to inquire into the validity of apportionment statutes of the respective states to determine whether there has been an infringement on the rights of the citizens by reason of improper or unlawful apportionment. The special concurring opinion of Mr. Justice Stewart most specifically points out that the decision—Baker v. Carr—decides only three things and no more:

"(a) that the court possessed jurisdiction of the subject matter; (b) that a justiciable cause of action is stated upon which appellants would be entitled to appropriate relief; and (c) * * * that the appellants have

standing to challenge the Tennessee apportionment statutes."

This action is one within the jurisdiction of the trial court and appellant's contention in this regard is without merit.

■ Appellant urges that this action should not be maintained by reason of the long delay in attacking the apportionment act, citing State ex rel. Mills v. Howell, 93 Wash. 257, 159 P. 777, Adams v. Bosworth, 126 Ky. 61, 102 S.W. 861, 10 L.R.A., N.S., 1184; In re Reynolds, 202 N.Y. 430, 96 N.E. 87; People ex rel. Woodyatt v. Thompson, 155 Ill. 451, 40 N.E. 307. However, we deem the announcement by the Supreme Court of New Jersey in the case of Asbury Park Press, Inc. v. Woolley, 33 N.J. 1, 161 A.2d 705, 706, as the preferable rule, succinctly stated in the syllabus as follows:

"Acquiescence for no length of time can legalize a clear violation of duty where the people have plainly expressed their will in the Constitution and have appointed judicial tribunals to enforce it."

Delay alone is no basis for refusing to consider the merits of this matter, for otherwise, under future changing circumstances any claimed rights of a person situate as respondent, could never be protected, merely because he did not immediately act.

This court, under Idaho Const. Art. V, § 9, has jurisdiction to review, upon appeal, decisions of the district courts. This action is not one of original jurisdiction, but is here by appeal from the decree of district court. Thus, before this court is the sole question, whether the trial court's decree is correct. The answer to this question hinges upon whether S.L.1951, ch. 60, § 1, and S.L.1941, ch. 87, § 1, are unconstitutional, no question being presented as to the constitutionality of S.L.1933, ch. 75, § 1, nor S.L.1917, ch. 165. Hereinafter are set forth the legislative enactments under decision or salient portions therefrom.

S.L.1917, ch. 165 provides:

"Section 25. The apportionment of the houses of the Legislature is and shall be as follows:

"Each county in the State of Idaho and any county which may hereafter be created shall constitute a senatorial district and shall elect one senator.

"The several counties shall elect members of the House of Representatives as follows: Each county shall elect one representative for each 2,500 votes and remaining fraction thereof amounting to 1,000 votes or more cast in said county at the last general election, based on the total vote cast for all candidates for Governor: *Provided,* That there shall be at least one representative from each county. It shall be the duty of the Secretary of State to certify to the county auditor

of each county on or before the first day of April, 1918, and biennially thereafter the number of representatives in the Legislature said county will be entitled. to elect at the following election. When any new counties have been created, subsequent to the last general election for Governor, the total vote cast for Governor in the territory included in any such new county and in the territory remaining in any county or counties from which said new county or counties have been created shall be estimated by the Secretary of State as nearly as possible from the election returns and the legislative apportionment figured thereon."

This chapter was incorporated in C.L. as 4:1 et seq.; in C.S. as § 51 et seq.; in I.C.A. as Title 65, ch. 2; and as later amended in I.C., as Title 67, ch. 2.

The 1933 act, amendatory of S.L.1917, ch. 165 is as follows:

"Section 1. That Section 65–203, Idaho Code Annotated, be, and the same is hereby, amended to read as follows:

"Section 65–203, REPRESENTATIVE DISTRICTS.—The several counties shall elect members of the house of representatives as follows: Each county shall elect one representative for each * * * *ten thousand*

*population of such county* and remaining fraction thereof amounting to * * *five thousand population or more. Population for this purpose shall be determined solely according to the last official United States Census;* provided, that there shall be at least one representative from each county." S.L. 1933, ch. 75.

The 1941 Act, amended the pertinent portions to read:

" * * * Each county shall elect one representative for each * * *twelve* thousand *five hundred* population of such county and remaining fraction thereof amounting to five thousand population or more. * * * *" S.L.1941, ch. 87.

The 1951 Act, now I.C. sec. 67–203, amended it to read:

" * * * Each county shall elect one representative for each * *seventeen* thousand * * population of such county and remaining fraction thereof amounting to * three thousand population or more. * * * *" S.L.1951, Ch. 60.

Idaho Const. ART. III, § 4; provides:

"Apportionment of legislature.— The members of the first legislature shall be apportioned to the several legislative districts of the state in proportion to the number of votes polled at

the last general election for delegate to congress, and thereafter to be apportioned as may be provided by law: provided, each county shall be entitled to one representative."

 In considering the question of the constitutionality of these acts, certain fundamental rules at all times must be kept in mind. The burden of showing the unconstitutionality of a statute is upon the party asserting it. Eberle v. Nielson, 78 Idaho 572, 306 P.2d 1083; Rich v. Williams, 81 Idaho 311, 341 P.2d 432. This court is without power to invalidate or nullify a constitutional act of the legislature; if the legislation does not clearly violate the Constitution, this court must and will uphold it. Padgett v. Williams, 82 Idaho 114, 350 P.2d 353. Every reasonable presumption must be indulged in favor of the constitutionality of a statute. Robinson v. Enking, 58 Idaho 24, 69 P.2d 603; Idaho Gold Dredging Co. v. Balderston, 58 Idaho 692, 78 P.2d 105.

The court in State ex rel. Brassey v. Hanson, 81 Idaho 403, 409, 342 P.2d 706, 709, quoting from other opinions, stated:

" 'It is fundamental that the judicial power to declare legislative action invalid upon constitutional grounds is to be exercised only in clear cases. * * *' [citation] Petition of Mountain States Telephone & Tel. Co., 76 Idaho 474, 480, 284 P.2d 681, 683.

" 'In the case of statutes passed by the legislative assembly and assailed as unconstitutional the question is not whether it is possible to condemn, but whether it is possible to uphold; and we stand committed to the rule that a statute will not be declared unconstitutional unless its nullity is placed, in our judgment, beyond reasonable doubt * * *. [citations]' Keenan v. Price, 68 Idaho 423, 433, 195 P.2d 662, 667."

Respondent's assertion, of unconstitutionality of the 1951 and 1941 acts, is founded on the premise of such gross inequality of representation in the house of representatives occasioned by the increase of the State's population, as shown by the 1960 Federal census, as to be arbitrary and capricious, and hence unconstitutional.

 It is essential in considering this assertion, to keep in mind that the constitution of the State of Idaho is not a delegation of power to the legislature but is a limitation on the power that it may exercise, and that the legislature has plenary power in all matters for legislation except those prohibited by the constitution. St. Joe Improvement Co. v. Laumierster, 19 Idaho 66, 112 P. 683, Achenbach v. Kincaid, 25 Idaho 768, 140 P. 529; State v. Nelson, 36 Idaho 713, 213 P. 358; State ex rel. Macey v. Johnson, 50 Idaho 363, 296 P. 588;. Lloyd Corp. v. Bannock County, 53 Idaho 478, 25 P.2d 217; Koelsch v. Girard, 54 Idaho 452, 33 P.2d

816; McGoldrick Lumber Co. v. Benewah County, 54 Idaho 704, 35 P.2d 659; Boughton v. Price, 70 Idaho 243, 215 P.2d 286; Utah Oil Refining Co. v. Hendrix, 72 Idaho 407, 242 P.2d 124; Rich v. Williams, 81 Idaho 311, 341 P.2d 432; State ex rel. Rich v. Idaho Power Co., 81 Idaho 487, 346 P.2d 596.

Under the Constitutional provisions establishing the legislative body (Idaho Const. Art. III, secs. 2 and 4), certain absolute limits are imposed on the scope of legislative action. Art. III, sec. 4, establishes the entitlement of each county to one representative. Art. III, sec. 2 establishes the maximum number of representatives at not to exceed three times the total number of senators which is fixed at one for each county.

Unlike constitutional provisions of some of the neighboring states (Cal.Const. Art. IV, sec. 5; Mont.Const. Art. V, sec. 4; N.M.Const. Art. IV, sec. 3; Ore.Const. Art. IV, sec. 2; Utah Const. Art. IX, sec. 3), the number of representatives which may constitute Idaho's house of representatives is not absolutely fixed. Idaho Const. Art. III, sec. 2. Idaho's legislature is authorized to establish up to the maximum number fixed by the Constitution, i. e. "at not more than three (3) times as many representatives as there are senators." We are not called upon, nor are we authorized, to rule as to the minimum number which may be

so fixed; that is a function reserved to the legislature.

The legislation with which we are here dealing, establishes a formula for determination of two variable figures, i. e., (1) the total number of representatives to constitute the house; and after fulfilling the constitutional requirements of one representative per county, (2) the actual apportionment of the balance of such total number among the counties that qualify for more than one representative. These figures are arrived at by the ministerial actions of the Secretary of State applying the one formula to fix these two variable items. I.C. secs. 67–203 and 67–204.

The legislature in 1933 used a larger divisor for the total population than the act of 1917; the act of 1941, used still a larger divisor than the act of 1933 and finally the act of 1951 used still a larger divisor than the act of 1941. It is interesting to note that in 1931 with a state population of approximately 445,000 (U. S. Census 1930) there were 70 representatives; in 1933 only 63 representatives; after adoption of the 1933 act, the number of representatives in the 1935 session dropped to 59. With a state population of approximately 525,000 (U. S. Census 1940), after enactment of the 1941 act, the number of representatives for the whole state still remained at 59 for all ensuing sessions, even after adoption of the 1951 act. Application of the 1933 act to

the population, shown by the 1960 census, of 667,191, would provide 79 representatives in the house; and application of the 1951 act to the 1960 census would result in 63 representatives.

We thus are faced with the problem of whether the legislative enactment establishing the 1951 formula for use by the Secretary of State, insofar as its application to the rights of this plaintiff are concerned, is unconstitutional. As has been pointed out, this formula is required to fulfill a two-fold purpose, (1) of establishing the total number of representatives for the next succeeding legislature, and (2) of allocating all in excess of the first forty-four representatives, (i. e., one per county) to the counties which by reason of greater population, are entitled to more than one representative.

It is clear that the constitutional requirement of one representative for each county, superimposed on the population requirement of the statute, will lead to discrepancies between the number of people who will be represented by each individual representative constituting the house of representatives, on a purely numerical basis. Respondent has forcefully pointed out such discrepancies, particularly by the exhibit in his complaint. Clark County, with a 1960 population of 915 persons, and Camas County with a 1960 population of 917, each is entitled to one representative under both the 1951 act and the 1933 act; Elmore Coun-

ty, with a 1960 population of 16,719, and Cassia County, with a 1960 population of 16,121, each likewise is entitled to only one representative under the 1951 act; whereas under the 1933 act each would be entitled to two representatives. These examples illustrate the extremes of the discrepancies in population representation. But, is such gross disparity so arbitrary and capricious that the 1951 act, and the 1941 act must be stricken down as unconstitutional, in favor of the previous 1933 act? Also, is this disparity created by the act itself, or created by the constitution? Another question is whether the disparity is the result of application of a set of facts and circumstances for which the legislation was not designed? Also, is such disparity violative of the equal protection clauses of Idaho's Constitution, Art. I, sec. 2 and of the United States Constitution, Fourteenth Amendment?

The constitutional limitations of one representative per county and a maximum of not to exceed three times the number of senators immediately destroys any possibility of representation based solely on a per-capita or per-voter basis. Attempting to compare the representation afforded by the constitutional requirement of one representative per county to the representation to be afforded on a per capita basis is impossible. The exhibit to respondent's complaint (which all parties agree is mathematically correct) establishes, that by ap-

plying the formula of the 1951 act to the 1960 population in each county, thirty-four counties, (of the total of forty-four), are entitled to one representative, and under the 1933 act the same population in each county would reduce the number of counties limited to one representative, to thirty-one (Bonner, Cassia and Elmore Counties, would then be entitled each to two representatives).

The members of the Idaho Constitutional Convention were fully cognizant of the impossibility of mathematical equality in election of representatives by reason of this constitutional requirement of one representative per county, as is shown by the record of their proceedings. Vol. I, Idaho Constitutional Convention, Proceedings and Debates, p. 454, et seq., and Vol. II, p. 1194, et seq. The constitution, as then proposed and later adopted, also authorizes distribution of the representatives on a district basis (Idaho Const. Art. III, § 4), which authority has not been utilized by the legislature in recent years. The delegates to the convention considered the problems inherent in the adoption of this requirement of one representative per county, and were aware of the disparity that arises as to representation between the sparsely settled areas and the more populous areas; yet they believed that the interests of the state would be best served, by such requirement, and their judgment in the premises was ratified by the electorate adopting the Constitution. Such determination by the convention, so ratified by adoption of the Constitution, cannot be questioned by this court.

The constitutional provisions only established limitations of the legislative branch of the government in this field. The enactments of the legislative branch of the government acting within the scope of its constitutional authority can no more be questioned by this court than can the Constitution itself. Diefendorf v. Gallett, 51 Idaho 619, 10 P.2d 307.

The 1951 enactment increased the number in the divisor to be applied to the total population. One effect of such increase in the divisor was to reduce the number of representatives to constitute the house of representatives. It is claimed that respondent is deprived of "equal protection" under the Idaho Constitution.

In discussing the equal protection clause of the United States Constitution, Mr. Justice Brennan in Baker v. Carr, supra, stated:

"Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action."

Without attempting to define fully the equal protection clause of the Idaho Constitution,

the legislature in enacting the 1951 statute established the number of representatives, and insofar as the Constitution allowed, apportioned them between the rural and more populous areas; any discrimination inherent in representation arises not by reason of arbitrary and capricious legislative action, but by reason of the constitutional requirement of one representative per county, and in some measure by not adopting a lower divisor, thereby to increase the total number of representatives for apportionment among the counties. Notably, however, the record shows that the parties to this proceeding, as well as the trial court, in recognizing the existence of aspects of inequitable apportionment under the formulae of both the 1951 and 1941 acts, also recognized aspects of inequitable apportionment under the 1933 act because it provided only "a greater degree of equal representation," as compared to the later acts.

The concurring opinion of Mr. Justice Stewart in Baker v. Carr, supra, in evaluating the holding of the Supreme Court of the United States in that case, in language most appropriate here, pointed out:

"The complaint in this case asserts that Tennessee's system of apportionment is utterly arbitrary—without any possible justification in rationality. The District Court did not reach the merits of that claim, and this Court quite prop-erly expresses no view on the subject. Contrary to the suggestion of my Brother HARLAN the Court does not say or imply that '*state legislatures must be so structured as to reflect with approximate equality the voice of every voter.*' p. 772. The Court does not say or imply that there is anything in the Federal Constitution '*to prevent a State, acting not irrationally, from choosing any electoral legislative structure it thinks best suited to the interests, temper, and customs of its people.*' p. 773. And contrary to the suggestion of my Brother DOUGLAS, the Court most assuredly does not decide the question, '*may a State weight the vote of one county or one district more heavily than it weights the vote in another?*' p. 724." (Emphasis supplied).

In the same concurring opinion it is further stated:

"In MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, 93 L.Ed. 3, the Court held that the Equal Protection Clause does not '*deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former.*' 335 U.S., at 284, 69 S.Ct. at 2. In case

after case arising under the Equal Protection Clause the Court has said what it said again only last Term—that *'the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others.'* McGowan v. [State of] Maryland, 366 U.S. 420, 425, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393." (Emphasis added.)

█ Without fully defining the meaning of the equal protection clause of the Idaho Constitution, it should be pointed out that equal protection is subject to all limitations inherent in the Constitution itself, and valid enactments of the legislature.

We do not deem this opinion to be contrary to the statements contained in Ballentine v. Willey, 3 Idaho 496, 506, 31 P. 994, 997, wherein this court stated:

"One of the very foundation principles of our government is that of equal representation, and the legislature is prohibited from enacting an apportionment law which does not give to the people of one county substantially equal representation to that given each other county in the state, based either upon the entire or voting population or upon some other just and fair basis. The reservation of rights by the people is broad enough to prohibit the legislature from passing an apportionment act which is manifestly unequal and unjust to the people of any portion of the state."

In the Ballentine case this court was dealing with a statute that allocated the number of representatives and senators; not a statute establishing a formula such as is here present. In the instant case the disparity of representation stems from the Constitution, not from the 1951 act. As pointed out by Justice Crockett in Parkinson v. Watson, 4 Utah 2d 191, 291 P.2d 400, at p. 409:

"We do not desire to be understood as departing from this basic precept: that the theory underlying our system of representative government, and our Constitution upon which it rests, presupposes that there must be reasonable correlation between representation and the number of inhabitants represented. But this principle is not absolute and of necessity cannot be, because practical exigencies require that it be modified by giving consideration to area representation."

█ The determination of the number of representatives to constitute the house of representatives, as well as their allocation above the requirement of at least one per county, are decisions resting peculiarly within the area for legislative action. Such determinations are dependent on the information established by the U. S. Census. Until such time as the legislature has had ample opportunity to fully examine

the impact of the 1960 Census on the apportionment of representatives throughout this State, in the light of Idaho Const. Art. III, §§ 2, 4 and 5, we cannot say that the 1951 Act is unconstitutional as having failed to grant representative rights of the citizenry of this State afforded by the Constitution.

Judgment reversed, and cause remanded with directions to enter appropriate decree adjudging that the 1951 act is constitutional, and directing appellant to certify the number of representatives to the county auditors of the State, on the basis provided by that act.

No costs allowed.

SMITH, C. J., and KNUDSON, J., concur.

McQUADE, Justice (dissenting).

It has been urged in briefs and argument that this Court lacks jurisdiction to hear the question presented. This contention is predicated upon Article 2, section 1, of the Idaho Constitution, which provides for the three departments of government. Apparently the theory is advanced upon the thought that this is a political matter resting solely with the legislative branch of government. Such proposition has been put to rest in Baker v. Carr, decided by the Supreme Court of the United States March 26, 1962.

(1) The majority apparently refers to Article 3, section 2, as it appears in the Idaho Code.

Difference of interpretation necessitates an explanation by this dissent why the 1911 Session Law version as herein applied sets forth the lawful constitutional amendment to Article 3, section 2. The Idaho Code provision is without foundation in law or fact.

(2) This Court takes judicial notice of Session Laws published by the Secretary of State, House and Senate Journals, legislative bills and amendments, and "legal" advertising notices to the electorate. House and Senate Journals, copies of the original bills, and newspaper notices all carry House Joint Resolution no. 13, as it appears in the 1911 Session Laws, p. 788, which was certified to by the then secretary of state to be the correct resolution passed by both houses of the Legislature and voted upon by the electors. An examination of the original bill signed by the Speaker and Lieutenant Governor reveals that the Session Law is correct. No presumption should be made in favor of a constitutional provision which has no lawful basis. Conjecture is not indulged as to why this variance exists, but this dissent relies upon what is believed to be the lawful provision.

Our controversy concerns the method devised to apportion representatives to the State Legislature. Presentation of the dis-

parity is made upon the showing that the elective 1962 Legislature will consist of representatives grossly disproportionately representing the people. Representation varies from one representative for 16,719 persons for Elmore County to Clark County, where one representative will represent 915 persons.

Our Constitution, Article 3, section 2, as adopted by the people in 1911, reads:

"Sec. 2. The Senate shall consist of one member from each county of the State now created or hereafter to be created and the House of Representatives shall consist of not to exceed three times the number of Senators. The Senators shall be chosen by the electors of the respective counties and the Representatives shall be chosen by the electors of the respective counties or disstricts into which the State may from time to time be divided by law."

This provision of our Constitution replaced the former provision which had been adopted at the time of statehood, which was as follows:

"The senate shall consist of eighteen members and the house of representatives of thirty-six members. The legislature may increase the number of senators and representatives: *provided,* the number of senators shall never exceed twenty-four, and the house of repre-

sentatives shall never exceed sixty members. The senators and representatives shall be chosen by the electors of the respective counties or districts into which the state may from time to time be divided by law."

Apportionment of the Legislature is indicated by Article 3, section 4, of the Constitution:

"The members of the first legislature shall be apportioned to the several legislative districts of the state in proportion to the number of votes polled at the last general election for delegate to congress, and thereafter to be apportioned as may be provided by law: provided, each county shall be entitled to one representative."

From time to time, various sessions of the Idaho Legislature have enacted legislation relating to apportionment of members of the House of Representatives, subject of our controversy being Chapter 60, paragraph 2, of the 1951 Session Laws, which provides:

" * * * The several counties shall elect members of the house of representatives as follows: Each county shall elect one representative for each * seventeen thousand * * population of such county and remaining fraction thereof amounting to * three thousand population or more. Population for this purpose shall be determined solely according to the last official Unit-

ed States Census; provided that there shall be at least one representative from each county."

Prior to the 1960 census this act of apportionment resulted in 15 representatives' being distributed among the various counties in addition to the 44 representatives allocated to the counties as provided by Article 3, section 4, total number of representatives being 59. The 1960 census reflects 22 counties having fewer than 8500 people per county comprise 15.2 per cent of the total State population. These counties will account for 35 per cent of the House members and 50 per cent of the senators.

Two prior acts of the Legislature, to wit, Chapter 75 of the 1933 Session Laws and Chapter 87 of the 1941 Session Laws, apportioned representatives in such a manner as to provide a total of 59 representatives, even though the State's population grew from 445,031 in 1930 to 524,873 in 1940, to 588,637 in 1950. There was an exception in 1941, when the House consisted of 64 members. Our 1960 census is 667,191, and, based upon the 1951 apportionment statute, the 1963 session of the Legislature will have 63 representatives.

Constitutions of other States vary in many respects, but fundamentally provide for a dissimilar ratio between the House and the Senate where there is a bicameral legislature. They afford representation generally on the basis of two or three representatives to one senator. Methods of determination of ratio and apportionment also vary. Invariably, limitations or ratios are established by constitutions within which legislatures establish representative government. Our provisions are silent as to express authority or as to denial of authority.

It has been urged that in absence of limitations the Legislature has inherent power to establish its proportions. Such reasoning calls for an interpretation of the Constitution. We must be mindful concerning rules of constitutional interpretation when applying reasoning, deductive or inductive. Our proposition is one which requires application of that interpretation which is most favorable toward carrying out the constitutional intendment.

"As a general rule, the usual principles governing the construction of statutes apply also to the construction of constitutions; but, inasmuch as one function of a constitution is to establish the framework and general principles of government, merely technical rules of construction are not to be applied so as to defeat the principles of the government or the objects of its establishment. The courts must regard constitutional provisions as more generic and more organic than other law with which the courts deal. Constitutional provisions are presumed to have been more carefully and deliberately framed than

is the case with statutes; hence, it is sometimes said that less latitude should be indulged by the courts in their construction." 16 C.J.S. Constitutional Law § 15, pp. 71–72.

"The prime effort or fundamental purpose, in construing a constitutional provision, is to ascertain and give effect to the intent of the framers and of the people who adopted it. The court, therefore, should constantly keep in mind the object sought to be accomplished by its adoption, and proper regard should be given to the evils, if any, sought to be prevented or remedied. Effect should be given to the purpose indicated by a fair interpretation of the language used, and that construction which effectuates, rather than that which destroys a plain intent or purpose of a constitutional provision, is not only favored but will be adopted. In construing a constitution it is presumed that the language has been employed with sufficient precision to convey the intention, although the intent may be shown by implications as well as by express provisions. A constitutional inhibition or prohibition usually extends no farther than the reason on which it is founded.

"While it has been said that the construction of a constitutional provision should be neither liberal nor strict, it is quite generally held that in arriving at the intent and purpose the construction should be broad or liberal, or equitable, as the better method of ascertaining that intent, rather than technical. The construction should not, however, be so liberal as to result in nullifying a plain mandatory provision of the organic law, or as to result in a statute becoming the higher law." 16 C.J.S. Constitutional Law § 16, pp. 72–78.

Our constitutional philosophy of representative government was announced in Ballentine v. Willey, 3 Idaho 496, 31 P. 994:

"* * * One of the very foundation principles of our government is that of equal representation, and the legislature is prohibited from enacting an apportionment law which does not give to the people of one county substantially equal representation to that given each other county in the state, based either upon the entire or voting population or upon some other just and fair basis. The reservation of rights by the people is broad enough to prohibit the legislature from passing an apportionment act which is manifestly unequal and unjust to the people of any portion of the state. It has authority to fairly apportion legislative representation, but it is prohibited from disfranchising. Whenever the legislature undertakes to deny the right of the people of any county a

just and fair representation in the legislative department of the state, it is not acting within the scope of its authority. * * * "

It appears that Article 3, section 2, is a self-operating provision in connection with Article 3, section 4. By self-operating, it is meant that after adoption of Article 3, section 2, in 1911, several new counties were created in the State. This provision assured one senator from each county then existing and each county thereafter to be created. As provided by the ratio of three to one, the membership of the House was also proportionately increased with the addition of each new county. This was not an idle gesture, in view of Sabin v. Curtis, 3 Idaho 662, 32 P. 1130, wherein this Court, in then interpreting the prior Article 3, section 2, to mean that the Legislature not having enacted apportionment legislation, the provisions of Article 19 should have been applied in consideration of representation for new counties in that they must share the same senators and representatives with the county or counties from which they had been created.

After this interpretation by the Court, senators and representatives were apportioned to the counties and districts by legislative acts. In 1917, the Legislature enacted a formula for apportionment of the members of the House of Representatives. This apportionment act was subsequent to

the amendment of Article 3, section 2, which came after Sabin v. Curtis, supra. It is important to note that Idaho had 27 counties in 1911, in view of the limitation of 24 being placed on the number of senators to be elected. The Legislature in 1911 had 24 senators and 60 representatives, which was the maximum provided for. After this limitation on number of senators was abolished with the amendment of this Article, several new counties were created, each being entitled to its one senator. Ultimately 44 counties were represented by senators in 1921. According to the apportionment formula, those counties elected 54 representatives on the basis of one to each county, and one additional for each 2500 votes or remaining fraction 1,000 votes cast in the preceding general election.

Another pertinent rule is that the state of the law at time of an amendment is controlling, and must be considered as that which the people had in mind. Idaho Mutual Benefit Assn. v. Robison, 65 Idaho 793, 154 P.2d 156.

Oklahoma reflected similarly on the subject of construction in Jones v. Freeman, 193 Okl. 554, 146 P.2d 564:

"That the acts complained of do not comply with the requirements of the Constitution is plain. The senatorial districts created do not 'contain as near as may be an equal number of inhabitants', and representative districts have

not been created in accordance with the mandatory provisions of sections 10(d) and 10(g), as above pointed out. While it is impossible to apportion representation in the two Houses with mathematical exactness, and the Legislature is, and should be, allowed some discretion in enacting such statutes, yet the provisions of the Constitution require at least as close an approximation to exactness and equality as is reasonably possible. * * *"

Basis of representation in the Legislature was considered in 1893 by this Court in Sabin v. Curtis, supra, when it interpreted Article 3, section 4:

"* * * The legislature has made no apportionment since that made by the provisions of said article 19 of the constitution. The constitutional apportionment was made on the basis of the votes cast for delegate to congress at the election next preceding the adoption of the constitution. The basis of representation was the voting population. Electors, alone, are represented. A given number in one county exercises the same political power as a like number in any other. Some departure, however, is made from said basis of representation by the proviso of section 4, art. 3, of the constitution, which provides that each county shall have at least one representative, in all future apportionments. But this does not change the basis of representation from the voting population to the county itself. The voting population was the basis of representation under the constitutional apportionment,—not the county, as a county. * * *"

Great latitude was vested in the Legislature in this prior constitutional provision, Article 3, section 2, and it must be noted with caution that authority of the Legislature to determine the number of senators or representatives was deleted from the 1911 amendment thereof. Such change forcefully impels reasoning toward the conclusion that indiscriminate authority was thereafter denied the Legislature.

This section does not grant a right to diminish or increase the size of the Legislature, but grants a right of apportionment of the members as provided in Article 3, section 2, which establishes a House to consist of a number not to exceed three times the number of representatives in relation to the number of senators in the Senate. This provision is for protection of the people. It was contemplated that senators would represent county areas of the State, whereas representatives would be apportioned according to population or some device akin thereto.

The ratio of one to three, as nearly as practicable, was thereby established. It is not the privilege of the Legislature to re-

duce this ratio to the extent which they have, but rather is a mandatory provision carrying out the Constitutional theory of representative government. Therefore, when legislation is calculated to defeat mandatory provisions of our Constitution it is unconstitutional.

In passing, it should be noted that Tennessee's Constitution, Article 2, section 5, has great similarity in this respect to our controversial provision. However, it was not a problem in Baker v. Carr, because the Tennessee Legislature had fulfilled its constitutional mandate.

Article 1, section 2, of our Constitution protects the people of Idaho from arbitrary action illustrated by the 1951 law establishing the restricted number of representatives in the Legislature:

> "All political power is inherent in the people. Government is instituted for their equal protection and benefit, and they have the right to alter, reform or abolish the same whenever they may deem it necessary; and no special privileges or immunities shall ever be granted that may not be altered, revoked, or repealed by the legislature."

This section of our Constitution provides protection for the people as does the Fourteenth Amendment of the Federal Constitution.

In this regard, excerpts from Baker v. Carr, supra, are illustrative of the protection which must be afforded to the people:

> "* * * Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action.

> * * * * * *

> "* * * This Court's answer to the argument that States enjoyed unrestricted control over municipal boundaries was:

> " 'Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution. * * * The opposite conclusion urged upon us by respondents, would sanction the achievement by a State of any impairment of voting rights whatever so long as it was cloaked in the garb of the realignment of political subdivisions. "It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence." ' Gomillion v. Lightfoot, 364

U.S. [339,] at 344–345, 81 S.Ct. [125,] at 129 [5 L.Ed.2d 110].

\* \* \* \* \* \*

" 'When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.' 364 U.S., at 347, 81 S.Ct., at 130."

The 220,000 population increase between 1930 and 1960 is virtually without representation in the House because of the arbitrary and capricious action by the Legislature in restricting the House number.

TAYLOR, Justice (dissenting).

The fundamental law of Idaho provides that the people of the state shall be represented in the House of Representatives on a basis of equality. Organic Act, Territory of Idaho, § 4; Idaho Const. Art. 1, §§ 2 and 3, Art. 3, §§ 2 and 4; U.S.Const. Amendment 14, § 1; Ballentine v. Willey, 3 Idaho 496, 31 P. 994; Annotation 2 A. L.R. 1337; Baker v. Carr (1962), 82 U.S. 691. The only permissible deviation from this basic right of equality is that engendered by necessary compliance with the constitutional provisions for one senator and one representative from each county, and a total house membership of not more than three times the number of senators. Within these limits it is the duty of the legislature under Art. 3, § 4, to apportion the house membership among the counties as nearly as possible in ratio to the voting population of each, and to revise such apportionment whenever changes in population disclose any inequality which can be corrected.

The record in this case establishes the fact that both the 1941 and 1951 apportionment acts provided for representation in the house on a grossly disproportionate basis. The record also reveals that those acts did not provide for representation on a basis as nearly proportionate to population as the constitution commands and permits. The 1941 and 1951 apportionment acts are, therefore, unconstitutional.

The record suggests that the 1933 act does not provide for representation on a basis as nearly proportionate to population as could be accomplished within the foregoing constitutional limitations. However, the constitutionality of that act is not here drawn in question. Furthermore, it is conceded that the 1933 act does provide for representation in the house more in relation to the population of the various counties than does either the 1941 or 1951 act. Its

validity, therefore, can be defended with better grace.

The judgment should be affirmed.

## ON DENIAL OF PETITION FOR REHEARING

McFADDEN, Justice.

■ It is the duty of this court to uphold legislative enactments against claims of unconstitutionality unless there is a clear violation of the constitution of the State or of the United States, or stated differently, every reasonable presumption must be indulged in favor of the constitutionality of a statute.

■ Plaintiff Caesar contends that the 1951 enactment establishing the apportionment of members of the House of Representatives for the forthcoming session of the legislature violates the provisions of the Fourteenth Amendment of the United States Constitution, which states: "No State shall * * * deny to any person within its jurisdiction the equal protection of the laws." This constitutional amendment does not prohibit classifications by the legislature, so long as the classifications are not made on an arbitrary or capricious basis and do reflect a policy based on reason. (See statement, Mr. Justice Brennan in Baker v. Carr, previously quoted in majority opinion, supra.) Here the legislature has allocated one representative per county in compliance with the provisions of Idaho Const. Art. III, Sec. 4, and then established the further classification of additional representatives on the basis of one for each additional 17,000 population and remaining fraction amounting to 3000 or more. The legislative plan is within the range of reasonable classification within the purview of the Fourteenth Amendment of the United States Constitution.

Previous legislative enactments determining the method of apportionment provided the same means as the 1951 Act, to accomplish apportionment, but prescribed a different divisor which by legislative determination would, at that time, accomplish fair apportionment under the constitution. No one of the three enactments herein considered is perfect. Each, in the judgment of the legislature enacting it, provided a method whereby a fair apportionment would be accomplished at the time the enactment was intended to apply.

■ The method by which apportionment should be made, aside from the constitutional mandate, is a legislative function; it would be an invasion of the legislative department of government for the Court to determine the method of apportionment.

278

The Idaho constitution itself, providing that each county have one representative creates the apparent numerical disparity, as previously pointed out. The claimed disparity of representation resulting from the application of the 1951 law to the 1960 census figures is not so clearly violative of the constitutional principal of equal protection that it must be stricken down. The claimed disparity is a subject for presentation to and consideration by, the legislature itself. The forthcoming session of the legislature will have opportunity to consider the 1951 enactment in light of the present conditions, and constitutional requirements and limitations on its authority (Idaho Const. Art. III, Secs. 2, 4, and 5).

In its wisdom the legislature can make this legislative determination properly within the scheme of the division of the departments of government provided by the constitution. The conclusions reached in the majority opinion are adhered to, and the petition for rehearing is denied.

SMITH, C. J., and KNUDSON, J., concur.

McQUADE, J., for rehearing.

TAYLOR, Justice (dissenting).

I dissent, except as to the denial of rehearing. With that conclusion I agree because of the futility of prolonging the litigation.